UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

LOUISIANA CRAWFISH PRODUCERS     :     NO. 6:10-cv-1085 (lead)
ASS'N WEST; ET AL.                          NO. 6:11-cv-0461 (member)

VERSUS                               :     JUDGE SUMMERHAYS

MALLARD BASIN, INC.; ET AL.         :     MAGISTRATE JUDGE HANNA

<u>MEMORANDUM RULING</u>

The present matters before the Court are cross-motions for summary judgment filed by (1) Louisiana Crawfish Producers Association West, Atchafalaya Basinkeeper, and the Louisiana Environmental Action Network (collectively, "plaintiffs") [doc. 280]; (2) defendants Mallard Basin, Inc. ("Mallard Basin") and Whiskey Bay Island, LLC ("WBI") [doc. 288], and (3) the United States Army Corps of Engineers and Chief of Engineers Lieutenant General Todd T. Semonite, in his official capacity (collectively, "COE") [doc. 292]. Also before the Court is plaintiffs' Motion to Strike [doc. 297]. These motions were filed in two related cases that have been consolidated: a Clean Water Act private citizen suit (the "Lead Case"), and a separate challenge to the administrative actions of the COE (the "Member Case"). All motions have been fully briefed and are now ripe for decision.

## I.
### BACKGROUND

This action began as a suit filed by Louisiana Crawfish Producers Association-West ("LCPAW") and Atchafalaya Basinkeeper, an association dedicated to the environmental

preservation of the Atchafalaya River Basin, against Mallard Basin and WBI,[1] relating to a water control system operated by Mallard Basin in and around Fisher Lake. Doc. 1. An anonymous source reported the water control activities to the COE in 2009. Doc. 38, att. 3 (COE00001–02). The COE conducted a site inspection in March 2010 and observed, inter alia, a new pump designed to bring water from the Whiskey Bay Pilot Channel to a borrow canal for fishing and an area of wetlands known as Fisher Bottoms, which is used for duck hunting. *Id.* It then issued a cease and desist order relating to these activities. *Id.*

Pursuant to the cease and desist order, Mallard Basin applied for an after-the-fact permit for the installation of its pump. Doc. 38, att. 6 (COE00007–17). The COE approved the application and issued Nationwide Permit No. 7 Permit Verification, No. MVN-2010-1032-WLL ("NWP Verification"), on June 28, 2010. Doc. 38, att. 13 (COE00047–49). Mallard Basin also applied for an after-the-fact permit for its construction of a conveyance ditch and water control structure. Doc. 38, att. 14 (COE00050–COE00052). Following a public comment period, the COE approved the application with Individual Permit No. MVN-2010-1080-WLL ("Individual Permit"), on October 6, 2010. Doc. 38, atts. 30 & 31 (COE00143–77).

On July 6, 2010, LCPAW and Atchafalaya Basinkeeper filed their petition in what became known as the "lead case" under the citizen suit provision of The Clean Water Act ("CWA"), 33 U.S.C. § 1365(b). Doc. 1. They alleged that Mallard Basin and WBI violated the CWA by filling wetlands and conducting other allegedly unauthorized and harmful activities, namely the pumping of water from Whiskey Bay Pilot Channel to Fisher Lake, and the dredging and damming of Fisher Lake. *Id.* at ¶¶ 22–51. Following issuance of the NWP Verification and Individual Permit, the

---

[1] Mallard Basin was the owner of the property at issue until July 25, 2011, when the property was acquired by Atchafalaya Investments, LLC. Doc. 91, p. 1 ns. 1, 3. WBI is the owner of adjacent property with servitudes over parts of the property at issue. *Id.* at p. 1 n. 2.

plaintiffs in the lead case and the Louisiana Environmental Action Network ("LEAN") also filed suit against the COE to challenge those permits in what is now known as the "member case." *See Louisiana Crawfish Producers Association – West v. Corps of Engineers*, No. 6:11-cv-0461 (W.D. La.). The lead case and member case were consolidated by order of the Court on September 7, 2011. Doc. 35. The plaintiffs then filed a first amended complaint against the COE, challenging the permits under the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), and the CWA, with the ESA cause of action relating to impact of the permitted activities on the Louisiana black bear. Doc. 48.

In July 2011, Mallard Basin transferred the property at issue to Atchafalaya Investments, LLC ("Atchafalaya Investments"), which requested that the COE also transfer the above permits to it. Doc. 102, att. 2, pp. 6–7 (COE00187–188). The COE decided to reevaluate the permits before considering the transfer request, pursuant to its authority under 33 C.F.R. § 325.7.[2] *Id.* at 8–10 (COE00189–191). It then conducted site inspections and invited public comment, which resulted in hundreds of pages of comments and exhibits from plaintiffs. *Id.* at 13–29, 67 (COE00194–210, COE00248); *see* doc. 102, att. 4, p. 26–doc. 102, att. 12, p. 1 (COE00430–824). After considering the public comments, the COE issued a Final Permit Re-evaluation and Revised Decision on the NWP Verification and Individual Permit on February 13, 2013. Doc. 102, att. 12, pp. 2–40 (COE00825–63). In that decision the COE affirmed its issuance of the permits and approved their transfer to Atchafalaya Investments. *Id.* Atchafalaya Investments, WBI, and Mallard Basin (collectively, "landowners") were then granted leave to intervene in the member action. Doc. 99.

---

[2] On motion of the COE, the consolidated case was stayed and remanded to the COE pending re-evaluation of the permitted activities. Docs. 68, 81, 82. The stay was lifted on the parties' joint motion on April 2, 2013, and Atchafalaya Investments was granted leave to intervene. Docs. 84, 85, 99.

Plaintiffs then filed a second amended complaint to address the transfer and reevaluation decision. Docs. 105, 117, 119. The Court also granted leave for plaintiffs to pursue additional discovery on their NEPA claims and to conduct a site inspection. Docs. 165, 175, 196.

In June 2014, Atchafalaya Investments applied for a modification to the individual permit. Doc. 269, att. 3, pp. 1–8, 9 (COE01070–77, COE01079). In that application it stated that modifications were necessary to maintain the already-permitted water control structure. *Id.* The COE approved the application without notice or comment on October 24, 2014. *Id.* at 84–94 (COE01153–63). The plaintiffs were granted leave to file a third amended complaint, to address the October 2014 modification to the permits. Docs. 219–21. On May 20, 2016, plaintiffs filed a final, fourth amended complaint, based on the de-listing of the Louisiana black bear as an endangered species in April 2016. Docs. 227, 230, 231. However, plaintiffs only eliminated certain requests for relief and maintained their causes of action relating to the endangered species. Instead, they asserted five causes of action relating generally to the permits and the October 2014 modification. Doc. 231. In Causes of Action 1 through 3, the plaintiffs alleged that the COE's decisions violated the ESA and APA based on the agency's failure to consult with the United States Fish and Wildlife Service and otherwise appropriately consider the impact to the Louisiana black bear. *Id.* at ¶¶ 214–23. In Causes of Action 4 and 5, the plaintiffs maintained their challenges to the COE's decisions under the NEPA and CWA. *Id.* at ¶¶ 224–34. They seek declaratory relief, vacatur and remand of the challenged permits, as well as an award of costs and fees. *Id.* at p. 37.

The Court then entertained Motions to Dismiss [docs. 224 and 240] by the COE, which argued that the de-listing of the Louisiana black bear mooted plaintiffs' first, second, and third causes of action. The Court agreed and dismissed same. Docs. 250, 265. The parties subsequently filed a joint submission setting forth their positions on the appropriate scope of the record for

judicial review, cross-motions for summary judgment, and additional arguments submitted by the plaintiffs for consideration of extra-record evidence. Docs. 273 att. 1, 280, 288, 292. The plaintiffs have also moved to strike a declaration attached by the landowners in their opposition to the plaintiffs' Motion for Summary Judgment. Doc. 297. The Court now considers the challenges to the scope of the record and inclusion of extra-record evidence, along with the motion to strike, before proceeding to the merits of the case under the cross-motions for summary judgment.

**II.**

**MOTIONS FOR SUMMARY JUDGMENT IN THE MEMBER CASE**

**A. Record Challenges – The Applicable law**

The claims at issue in the Motions for Summary Judgment – alleging violations of the CWA and NEPA through the COE's permitting decisions – challenge a federal agency action and are thus governed by the Administrative Procedure Act. APA review of an agency action requires a court to review "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially by the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Under this principle, known as the "record rule," "[a]gency action is to be upheld, if at all, on the basis of the record before the agency at the time it made its decision." *Indep. Turtle Farmers of La., Inc. v. United States*, 703 F.Supp.2d 604, 610 (W.D. La. 2010) (quoting *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 327 n. 8 (5th Cir. 1988)). The record rule is not absolute, however, and courts within this circuit have recognized several exceptions to it.[3] *Id.* at 611. Most relevant to this case,

---

[3] In the broadest construction within this circuit, such exceptions may apply where:
> (1) the agency does not adequately explain its action in the administrative record supplied to the court; (2) the agency failed to consider factors relevant to its final decision; (3) the agency considered evidence omitted from the administrative record; (4) the case is so complex that additional evidence is needed to enable the court to clearly understand the issues; (5) evidence arising after the agency action shows whether the decision was correct or not; (6) the agency is sued for failing to take action; (7) the case arises under the National Environmental Policy Act ("NEPA"); and (8) relief is at issue, especially at the preliminary injunction stage.

a NEPA violation claim may invite consideration of extra-record evidence, described in full below. *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 247 (5th Cir. 2006). Extra-record evidence may also be allowed to determine whether plaintiffs can satisfy a jurisdictional prerequisite, such as standing. *Chesapeake Climate Action Netw. v. Exp.-Imp. Bank of the U.S.*, 78 F.Supp.3d 208, 217 (D.D.C. 2015).

## B. Application of the Law to Plaintiffs' Challenges

### 1. Record completion and supplementation

The plaintiffs make no challenge to the documents [docs. 38, 102, 115, and 269] already lodged by the COE as part of the administrative record. Doc. 273, att. 1. Instead they argue that (1) certain documents and exhibits have been erroneously omitted from the administrative record and (2) certain documents that are not part of the administrative record should nonetheless be considered by the Court in determining the merits of the case. *Id.*

In the first category, plaintiffs focus on documents relating to the COE's response to limited discovery permitted on the permit modification. Namely, they request incorporation into the administrative record of (1) a March 2016 letter from the Department of Justice with production of documents [doc. 273, att. 2], (2) verification of Michael Herrmann, COE of Engineers regulatory project manager for the Individual Permit, on the same production of documents [doc. 273, att. 3], (3) Department of Justice chart listing the documents produced [doc. 273, att. 4], (4) aerial photographs produced by Michael Herrman at his August 2016 deposition [doc. 273, att. 5], and (5) other documents and memoranda involving the COE and relating to 2009 and 2010

---

*Triplett v. Fed. Bureau of Prisons*, 2009 WL 792799, at *8 (N.D. Tex. Mar. 24, 2009) (citing *ITT Fed. Servs. Corp. v. United States*, 45 Fed. Cl. 174, 185 (1999)).

complaints about the Whiskey Bay pump and the March 2010 site visit conducted by the COE [doc. 273, atts. 6–10].[4]

The COE objects to inclusion of these documents and exhibits, with the exception of the final set, because they post-date the last challenged permitting decision and therefore could not have been considered by the COE in making that decision. Doc. 292, att. 1, p. 19. Plaintiffs do not oppose this point or seek to admit the documents and exhibits under any extra-record exception. Accordingly, the first four sets of documents and exhibits described above will not be considered. As for the fifth set, the plaintiffs have produced testimony from project manager Michael Herrmann that these documents were part of his file and would have been considered by the COE in its 2010 permitting considerations. Doc. 273, att. 26, pp. 36–37. The COE agrees that these documents were before the agency and should be added to the record. Doc. 292, att. 1, pp. 19–20. Thus the fifth set will also be considered as part of the administrative record.

In the second group plaintiffs submit, in relevant part,[5] a report from plaintiffs' expert Dr. Paul Kemp [doc. 273, att. 12], as well as declarations from wetland ecologist Dr. Gary Shaffer [doc. 273, att. 13]; Atchafalaya Basinkeeper executive director Dean Wilson [doc. 273, atts. 14–16]; and crawfisher Jody Meche [doc. 273, att. 20]. Finally, plaintiffs submit transcripts from their 2015 and 2016 depositions of COE project manager Michael Herrmann.[6] Doc. 273, atts. 25 & 26.

---

[4] The joint submission also points to documents from 1999 to 2003 relating to the construction and maintenance of the water control structure in that period. Doc. 273, att. 1, p. 6. However, the parties make no argument for inclusion or exclusion of those materials and do not rely on them in their motions for summary judgment. Thus, the Court will not consider them.

[5] The plaintiffs submit certain exhibits which they maintain should be considered because they are relevant to the issue of standing. Doc. 280, att. 1, p. 26. However, the COE does not contest standing. Doc. 304, p. 5 n. 1. The Court finds no basis for doubting plaintiffs' standing, and so will not review extra-record exhibits on that subject.

Plaintiffs also submit a 2014 memorandum on acceptance of transportation by permit applicants [doc. 273, att. 11]. They make no argument for inclusion of this memorandum under any exception to the record rule, however, in any of the summary judgment briefing, nor do they cite the document as part of their arguments on the merits.

[6] Plaintiffs also submitted 2012 declarations from Dean Wilson [doc. 273, att. 17] and Jody Meche [doc. 273, atts. 18 & 19], as well as declarations from LCPAW president Mike Bienvenu [doc. 273, att. 21], Henderson mayor Sherbin Collette [doc. 273, att. 22], and LCPAW member Harold Schoeffler [doc. 273, att. 23]. Doc. 273, att. 1. As they subsequently asserted, and the COE does not dispute, these documents are already in the administrative record. *See*

Plaintiffs argue that the Kemp expert report [doc. 273, att. 12], the declaration of Dr. Gary Shaffer [doc. 273, att. 13], Dean Wilson [doc. 273, atts. 14–16], and the Michael Herrmann depositions [doc. 273, atts. 25 & 26] should be considered under the NEPA exception as providing evidence of impacts, alternatives, and other relevant factors that the COE allegedly failed to consider.[7] Doc. 280, att. 1, pp. 27–28.

The COE argues that the NEPA exception does not apply, because plaintiffs have not shown that the COE "negligently or deliberately excluded these or any other document" or "failed to explain the challenged actions so as to frustrate judicial review." Doc. 292, att. 1, p. 30 (citing *Medina Cnty. Environmental Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010)) (alterations omitted). In reply, the plaintiffs maintain that the extra-record evidence sought to be introduced under the NEPA exception is properly admitted under that exception and *Medina*.

As plaintiffs observe, *Medina* was not a NEPA case and relates only to the general admissibility of extra-record evidence. It does not explicitly overrule prior decisions concerning exceptions and should not be read "as a sea change on this circuit's law on extra record evidence." *Gulf Coast Rod Reel & Gun Club v. U.S. Army Corps of Engineers*, 2015 WL 1883522, at *3 (S.D. Tex. Apr. 20, 2015); *accord La Union del Pueblo Entero v. FEMA*, 141 F.Supp.3d 681, 694–95 (S.D. Tex. 2015). Accordingly, the COE's contention that plaintiffs have not shown "negligent or deliberate exclusion" or a failure to explain the challenged action, two exceptions derived from

---

doc. 296, att. 1. Accordingly, there is no need to determine their admissibility as extra-record evidence and they are considered to the extent they are relied upon in the briefs.

[7] The COE argues that the final Jody Meche declaration [doc. 273, att. 20] may not be considered for the merits of the case. Doc. 304, p. 14. However, plaintiffs only seek to introduce and only reference the first two Meche declarations [doc. 273, atts. 18 & 19], which are already included in the administrative record, in their challenge to the merits. Doc. 280, att. 1, p. 27; doc. 296, p. 29. Accordingly, there is no basis for determining whether the final declaration may be admitted under the NEPA exception.

*Medina*, 602 F.3d at 706, does not refute the plaintiffs' arguments for inclusion of these documents under the NEPA exception.[8]

NEPA requires that an agency take a "hard look at environmental consequences" before making a decision, but only "prescribes the necessary process for preventing uninformed—rather than unwise—agency action." *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 350–51 (1989). Accordingly, a NEPA claim attacks the agency's procedures, or lack thereof, in considering the environmental impact of a project. "The omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omissions to attention." *Nat'l Audubon Soc'ty v. Hoffman*, 132 F.3d 7, 15 (2d Cir. 1997). Thus, "deviation from the record rule to review procedural integrity in a NEPA claim is a logical conclusion." *Save Our Wetlands, Inc. v. Conner*, 1999 WL 508365, at *2 (E.D. La. Jul. 15, 1999) (citing *Sierra Club v. Hassell*, 636 F.2d 1095, 1097–98 (5th Cir. 1981)).

As the COE emphasizes, admission under the NEPA exception is not automatic. Instead, the court should only consider extra-record evidence where "the administrative record is so inadequate as to prevent the reviewing court from effectively determining whether the agency considered all environmental consequences of its proposed actions." *Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Svc.*, 883 F.3d 644, 658 (6th Cir. 2018) (quoting *Hoffman*, supra, 132 F.3d at 15). Where those documents are cumulative of the administrative record, their admission should be denied. *Id.* at 658–59.

---

[8] As the court noted in *La Union del Pueblo Entero*, supra, the three circumstances supporting admission extra-record evidence in *Medina* may be read to encompass all eight of the exceptions described above. 141 F.Supp.3d at 694–95. Under such a reading, the NEPA exception (described more fully below) would likewise qualify under *Medina* as providing the court with "background information" relevant to determining whether the agency considered all appropriate factors in reaching its decision. *See Medina*, 602 F.3d at 706.

The COE argues that some of the proposed extra-record evidence should not be admitted because it is post-decisional. "[E]xceptions to the normal rule regarding consideration of extra-record materials only apply to information available at the time, not post-decisional information." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130–31 (9th Cir. 2012) (cleaned up). Additionally, post-decision information "may not be advanced as a new rationalization for either sustaining or attacking an agency's decision." *Sw. Ctr. for Biological Diversity*, 100 F.3d 1443, 1450 (9th Cir. 1996); *accord Latin Americans for Social and Econ. Dev. v. Admin'r of Fed. Hwy. Admin.*, 858 F.Supp.2d 839, 856 n. 11 (E.D. Mich. 2012) (citing *Wisconsin Elec. Power Co. v. Costle*, 715 F.2d 323, 327 (7th Cir. 1983)) & *Coalition of Concerned Citizens to MakeARTSmart v. Fed. Transit Admin. of U.S. Dep't of Transp.*, 2016 WL 8919680, at *3 (D.N.M. Jul. 15, 2016); *cf. Oceana, Inc. v. Locke*, 674 F.Supp.2d 39, 47 (D.D.C. 2009) (striking post-decisional testimony but noting that, in a previous case, a post-decisional letter by a scientist challenging the manner in which an agency relied on her own research was properly admitted as extra-record evidence). "Although [the duty to consider new information] may be true for an agency, the Court's role . . . is to review the [agency's] decision to grant [an] application based upon the materials before the [agency] at the time of its decision and upon acceptable extra-record materials, if any." *MakeARTSmart*, 2016 WL 8919680 at *3.

The last challenged decision in this matter took place in 2014. Kemp was not retained by plaintiffs until "late 2015," and his report is dated July 2017. Doc. 273, att. 12, p. 1 (COE01228). The report is based on (1) one site visit, conducted in 2016, (2) water levels recorded from 1997 to 2016, (3) undated aerial photographs, topographic survey maps, and images and lidar data from Google Earth Pro, and (4) a review of the geological, hydrological, and historical literature on past and present physical, biological, and human influences on Fisher Lake. *Id.* at 9 (COE01236). The

author relies heavily on the post-decision site visit and the data, some of which is post-decision, for his opinions about the project's impact on the hydrology, ecology, and navigability of Fisher Lake. The extra-record Wilson and Shaffer declarations (regarding alleged impacts of the facilities on bald cypress trees) are based on observations and photographs taken in 2015 and 2016. *See* doc. 273, atts. 13–16. The plaintiffs chiefly rely on these exhibits to show that the COE has erred because post-decisional data and observations disprove its findings about the impacts of the permitted project and modification.[9] These cannot be used to negate the sufficiency of the COE's consideration of conditions that existed at the time of the challenged decisions, which occurred between 2010 and 2014, and will not be considered in relation to the merits of the challenged decisions. As for the Michael Herrmann depositions, the COE offers no specific objection and a review of those exhibits shows that they are potentially relevant to the adequacy of the COE's challenged decision-making processes. Accordingly, these exhibits will be admitted and considered under the NEPA exception but will not be considered for the CWA claim.

### 2. *Motion to Strike*

Finally, the plaintiffs object to consideration of an exhibit attached to the landowners' opposition [doc. 287] to the plaintiffs' Motion for Summary Judgment. This exhibit is a declaration from Kim Sebastien, an independent contractor employed by Atchafalaya Investments. *See* doc. 287, att. 1. The plaintiffs argue that it should be stricken because it was filed over five months past

---

[9] Plaintiffs analogize this case to *Holy Cross v. U.S. Army Corps of Eng'rs*, 455 F.Supp.2d 532 (E.D. La. 2006). Doc. 296, p. 29. There the Eastern District considered declarations and facts that arose after Hurricane Katrina in reversing the COE's pre-Katrina decisions regarding expansion of locks in the Industrial Canal. 455 F.Supp.2d at 538–40. It noted that the effects of Katrina "have exposed the inadequacy of the Corps' planning and analysis" and that "in the year since Katrina, local circumstances have drastically changed." *Id.* Accordingly, the post-decisional evidence was admitted because it "merely shed light" on the COE's failure to adequately address certain risks in light of the subsequent hurricane's impact, and because "the underlying purpose of NEPA [would] not be served if the Corps moves forward with [a canal project] according to a plan devised almost a decade ago." *Id.* at 540. Here, as the COE notes, there is no such new event alleged to have "drastically changed" conditions around Fisher Lake and exposed the insufficiency of the COE's considerations. Accordingly, *Holy Cross* does not reflect any exception to the general ban on post-decisional evidence that applies in this matter.

the deadline imposed by the magistrate judge for the parties to identify extra-record evidence. Doc. 297, att. 1. In the alternative, they argue, the Court should consider a new declaration from Dean Wilson, Atchafalaya Basinkeeper executive director, in response to the Sebastien declaration. *Id.* The COE takes no position on the admission of the Sebastien declaration but opposes the plaintiffs' request to admit the new Wilson declaration. Doc. 307. The landowners have filed no opposition to the Motion to Strike and their time for doing so has passed.

The landowners note that Sebastien's declaration is introduced to address extra-record statements in the plaintiffs' Motion for Summary Judgment. Doc. 287, p. 2. The declaration responds to a statement in the Kemp expert report about the potential impact of standpipe drop weirs at Fisher Lake on passage by fish and other aquatic animals.[10] Doc. 287, att. 1, p. 2. However, the only extra-record evidence deemed admissible on the merits of a claim are the depositions of Michael Herrmann, *supra*. The Sebastien declaration is therefore irrelevant in addition to being untimely, and the Motion to Strike is hereby granted.

### C. Motions for Summary Judgment

#### *1. Standards*

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The Court must deny the motion for summary judgment if the movant fails to meet this burden. *Id.*

---

[10] Sebastien also lends his support to a 2016 management plan provided by Louisiana Department of Wildlife and Fisheries wetland biologist Jason Olszack. Doc. 287, att. 1. This plan is not part of the administrative record, nor could it be introduced as extra-record evidence because of its post-decisional status. Accordingly, Sebastien's statements on that matter have no relevance.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

### 2. Application

The member case – which is the subject of the COE's and plaintiffs' Motions for Summary Judgment – arises under the APA as a challenge to the COE's actions in the above-described permitting decisions, based on alleged violations of the CWA and NEPA.[11] Mallard Basin and WBI also move for summary judgment, arguing that the lead case should be dismissed as moot. Doc. 288, att. 1.

---

[11] The plaintiffs maintain that they are entitled to admission of the statement of undisputed material facts filed with their Motion for Summary Judgment, because the COE did not submit a statement of disputed facts/facts on which there exists a genuine issue to be tried in response. Doc. 296, p. 8. As the COE points out, however, it filed a combined "Counter-Statement and Statement of Material Facts" [doc. 292, att. 2] in which it disputed all statements plaintiffs seek to have admitted except (1) that the ditch and dam are in navigable waters of the United States and (2) all facts establishing standing. There is no basis for deeming plaintiffs' other statements admitted.

### a. *APA challenges*

Under the APA, a court may only set aside an agency action in limited circumstances, including, as raised here "if it is arbitrary [and] capricious . . . or otherwise not in accordance with law."[12] *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 580 (5th Cir. 2016); *see* 5 U.S.C. § 706(2). The court presumes that the agency's decision is valid and so the burden is on the party challenging the agency action to demonstrate that such action should be invalidated. *Buffalo Marine Svcs., Inc. v. United States*, 663 F.3d 750, 753 (5th Cir. 2011). "The court's role is not to weigh the evidence pro and con but to determine if the agency action was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Delta Found. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002) (internal quotations omitted). The challenged agency decision "need not be ideal, so long as it is not arbitrary and capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994) (internal quotations omitted).

Here the plaintiffs challenge the following agency actions as arbitrary and capricious, as well as contrary to the CWA and NEPA:

 (1) the 2010 nationwide permit verification, which provided after-the-fact authorization for Mallard Basin's installation of a water pump with intake and outfall pipes off the Whiskey Bay Pilot Channel;

 (2) the 2010 individual permit, which provided after-the-fact authorization for Mallard Basin's construction of a conveyance ditch and water control structure;

---

[12] Judicial review is limited to "final agency action[s]." 5 U.S.C. § 704. No party disputes that the above permitting decisions constituted final actions of the COE.

(3) the 2013 reevaluation and transfer decision, through which the COE reevaluated and affirmed its issuance of the above permits upon Atchafalaya Investment's request to have the permits transferred after its acquisition of the land; and

(4) the 2014 modification decision, through which the COE approved Atchafalaya Investment's request to make modifications that would address the erosion of an earthen dam.

Doc. 231, pp. 15–32. Specifically, plaintiffs allege that the above actions should be overturned because the COE failed to adequately consider (1) alternatives to the permitted projects and (2) negative impacts of the projects on the Fisher Lake ecosystem and crawfishing industry. Doc. 280, att. 1, pp. 11–23. They also allege that the COE violated related mandatory regulations and related guidelines in its consideration of the 2014 permit modification requirement. *Id.* at 23–25. [13]

Because the Court cannot consider the extra-record evidence admitted above under the NEPA exception in reviewing the alleged CWA violations, it handles the CWA allegations first and then considers both the administrative record and the Herrmann depositions in determining whether the COE committed a NEPA violation.

---

[13] As the COE notes, the NWP verification was not subject to § 404(b)(1) of the CWA or COE regulations. The COE may issue general permits (including nationwide permits), rather than individual permits, for "any category of activities" that has "only minimal adverse environmental effects when performed separately, and will only have minimal cumulative adverse effect on the environment." 33 C.F.R. § 330.1(b); 33 U.S.C § 1344(e)(1). Accordingly, issuance of the nationwide permit necessarily includes a finding that the covered activities categorically only have minimal adverse impact. An individual may still seek verification of the authorization by a nationwide permit. 33 C.F.R. § 330.6. However, the verification is limited to determining that the proposed activity is covered by the nationwide permit rather than the "probing assessment" required for issuance of an individual permit. *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F.Supp.2d 9, 27 (D.D.C. 2013). A reviewing court must "accord substantial weight" to the COE's interpretation of its permitting authority under 33 U.S.C. § 1344, because an "agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *City of Shoreacres v. Waterworth*, 420 F.3d 440, 445 (5th Cir. 2005) (internal quotations omitted). Plaintiffs do not challenge the COE's verification of the 2010 nationwide permit. Accordingly, there is no claim that the COE failed to adequately consider alternatives or impacts for that decision under the CWA.

### i. *CWA violations*

#### a. *Project purpose and alternatives*

The plaintiffs first argue that the COE violated provisions of the CWA and associated guidelines in the 2010 individual permit and 2013 reevaluation and transfer decisions, through their definition of the project purpose and consideration of alternatives. In deciding whether the COE properly applied applicable guidelines, the Court should "examine the administrative record—not as a chemist, biologist, or statistician, but as a reviewing court exercising its narrowly defined duty of holding agencies to certain minimal standards of rationality." *Abita Springs v. U.S. Army Corps of Eng'rs*, 153 F.Supp.3d 894, 921 (E.D. La. 2015). Rather than conducting a de novo trial of the issue, the Court simply reviews the COE's decision under the arbitrary and capricious standard. *Id.* Under the CWA, alternatives must be evaluated in terms of the overall project purpose, which should be "specific enough to define the applicant's needs, but not so restrictive as to preclude all discussion of alternatives." *Id.* at 920 (quoting *Gouger v. U.S. Army Corps of Eng'rs*, 779 F.Supp.2d 588, 605 (S.D. Tex. 2011)).

Section 404 of the CWA makes it illegal to discharge dredged or fill material into navigable waters of the United States, unless permitted by the COE at specified disposal sites. 33 U.S.C. §§ 1311(a), 1344(a). Related guidelines single out the wetlands for special protection and provide that dredged or fill material should not be discharged into the aquatic ecosystem if there is a "practicable alternative . . . which would have less adverse impact on the aquatic ecosystem," provided that the alternative does not produce other significant environmental consequences. 40 C.F.R. §§ 230.1, 230.10. Because the specific location of the project may play a significant role in fulfilling the overall project purpose, it can restrict the number of practicable alternatives. *Id.* However, the relevant regulation provides that "no discharge of dredged or fill material shall be

permitted if there is a practicable alternative . . . which would have less adverse impact on the aquatic ecosystem," provided that the alternative "does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Further, where the activity is not "water dependent," the agency must presume that practicable alternatives not involving special aquatic sites are available, "unless clearly demonstrated otherwise." *Id.* at § 230.10(a)(3).

In the 2010 individual permit decision, the COE identified the goal of the proposed activities as "establishing and maintaining a high quality wetland environment capable of supporting various fish and wildlife resources" and "[providing] high quality forested wetland habitat that supports fish and wildlife resources which benefit both user (recreational and commercial) and non-user groups." Doc. 38, att. 30, pp. 1–2 (COE00143–44). In the 2013 reevaluation and transfer decision, the COE noted that Atchafalaya Investments had stated "that it intends to continue to follow the moist soil management plan both for duck hunting and for other wildlife and recreational uses." Doc. 102, att. 12, p. 9 (COE00832). The COE acknowledged that the project goals relating to waterfowl and wetland habitats could be satisfied on a non-wetland site, but that "the success of the dual and complimentary purposes of these projects is to a great degree dependent on siting within a wetland." *Id.* It also noted that the project goals could be accomplished with only minimal wetland impacts in Fisher Bottoms, given the existing water control structures there. *Id.*

For the 2010 individual permit, the COE's consideration of alternatives is summarized at its permit evaluation and decision document. Doc. 38, att. 30, pp. 2–3 (COE00144–45). There the COE rejected a no-action alternative (removal of the water control structure and cessation of pumping) because it would allow invasive vegetation "to invade and choke out the existing shallow water habitat and desirable emergent vegetation species that waterfowl and many other species

utilize" and result in several other negative consequences, including the elimination of a suitable habitat for several animal and fish species, losses to the regional commercial fishing industry, and a decline in recreational fishing and hunting opportunities. *Id.* The COE then considered whether alternative project designs existed and concluded that "[t]he current design is believed to be the most practical and beneficial." *Id.* Finally, it determined that "[u]tilization of other sites would not meet the overall project purpose as described above." *Id.*

In the decision on the 2013 reevaluation and transfer, the COE again reviewed the potential impacts of a "no action" alternative and highlighted several negative consequences of returning Fisher Bottoms to "pre-project" conditions. Doc. 102, att. 12, pp. 8–10 (COE00831–33). It also considered other project designs and concluded that a smaller project design "would not offer a less damaging practicable alternative because less pumping and less water storage capacity would more likely make preservation of the present wetland habitat more difficult." *Id.* at 10–11 (COE00833–34). Accordingly, it found the current design "to be the most practical and beneficial option." *Id.* Finally the COE considered alternative sites, including COE-managed boat launches and state-owned wildlife parks. *Id.* It rejected these, however, because the alternatives would not allow for the hunting and private enjoyment of wetlands possible at the current site. *Id.* It also noted benefits to keeping the operations at Fisher Bottoms, namely the preservation of wildlife diversity and protected wetland resources that had developed in that area due to the hydrological management practiced there for over 50 years. *Id.*

The plaintiffs contend that the projects were not water dependent and that the COE "failed to apply and rebut the presumption that practicable non-wetland alternatives are available . . . ." Doc. 280, att. 1, p. 15. They argue that, despite the considerations noted above, the COE "indicated the project was not water-dependent by checking 'Yes' to the question: 'if the project is in a special

aquatic site and is not water-dependent, has the applicant clearly demonstrated that there are no practicable alternative sites available?'" *Id.* at 16; *see* doc. 38, att. 30, p. 14 (COE00156); doc. 102, att. 12, p. 37 (COE00860). The COE argues that the overall purpose of the project was framed as improving and maintaining wetland habitat conditions at Fisher Bottoms, thus making the project water-dependent. It also maintains that it was only answering the second half of the question and that while "not applicable" might have been a better answer, that answer "does not appear to have been available on the standard form." Doc. 292, att. 1, pp. 23–24.

"[C]lassification of an activity as 'non-water dependent' does not serve as an automatic bar to issuance of a permit . . . . [It] simply necessitates a more persuasive showing than otherwise concerning the lack of alternatives." *Louisiana Wildlife Fed'n, Inc. v. York*, 603 F.Supp. 518, 527 (W.D. La. 1984), *aff'd in part and vacated in part*, 761 F.2d 1044 (5th Cir. 1985). Even if the project purpose could be deemed not water-dependent, the COE's analysis reflects that no **practicable** non-wetland alternatives were available in light of the project goals, the minimal negative consequences for the Fisher Bottoms wetlands, and the significant disadvantages to relocating the project/removing it from Fisher Bottoms. The plaintiffs argue that the COE defined the project purpose too narrowly, because a goal of improving and maintaining wetland habitat conditions at Fisher Bottoms would automatically preclude any other site. However, "the Corps has a duty to take into account the objectives of the applicant's project. Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." *Louisiana Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985). While the applicant's purpose must be legitimate and he may not define the project so narrowly as to preclude consideration of any alternative site, the COE "is not entitled to reject [its] genuine and legitimate conclusion" of the advantages – including economic benefits – of a site-

specific project in considering whether practicable alternative locations exist. *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989) (holding that COE was not allowed to reject applicant's conclusion that construction of a specific type of golf course "was economically advantageous to its resort development.") The plaintiffs fail to show any error based on the record to the COE's findings above on the consequences of relocating the project to a non-wetland site or redefining project goals to be non-specific to Fisher Bottoms. Accordingly, they have not shown that the COE's determination was arbitrary or capricious in this regard.

The plaintiffs also maintain that the consideration of alternatives was inadequate, because the 2010 decision did not actually discuss any alternatives and because in the 2013 decision the COE had arbitrarily limited alternative sites to its own boat launches and nearby state-owned wildlife parks and considered the availability of hunting as a relevant factor. Doc. 280, att. 1, p. 15. Plaintiffs fail to identify any alternatives to those sites in the record, however, or to show that the consideration of hunting and private enjoyment of the wetlands was an illegitimate objective under the standards above. They also show no error to the COE's conclusion that alternative project designs were impracticable. Finally, considering the legitimate, Fisher Bottoms-specific project goals, plaintiffs fail to show that the COE's finding of no practicable alternatives was in error. Accordingly, plaintiffs cannot show that the COE's analysis of alternatives was arbitrary and capricious, or illegal, under the CWA.

### b. Consideration of ecosystem impacts

The plaintiffs argue that the COE violated the CWA by not adequately considering impacts of the project on the Fisher Lake ecosystem, specifically the effect on bald cypress trees in Fisher Lake. Doc. 281, att. 1, pp. 19–21. Plaintiffs also assert that the COE violated the CWA in its alleged failure to consider impacts of the 2014 modification. *Id.* at 21–22.

In support of the cypress claim, plaintiffs rely on evidence already deemed inadmissible for the CWA claims – specifically, opinions from their experts based on post-decisional site visits and observations of cypress tree deterioration. Doc. 280, att. 1, pp. 19–20. The plaintiffs present no admissible evidence to show that the COE's decisions – which specifically noted minimal adverse impacts to the Fisher Lake ecosystem and multiple advantages to the habitat – was erroneous on this front, or that its consideration was inadequate.

As for the allegation that the COE failed to consider impacts as part of the 2014 permit modification decision, plaintiffs complain that that decision "includes checkboxes and unsupported assurances that [the COE] 'assess[ed] environmental impacts,' that 'alternatives . . . were considered," and that '[the COE] found no significant change in environmental or socioeconomic impact.'" *Id.* at 21 (quoting doc. 269, att. 3, pp. 85–87 (COE01154–56)).

As the COE points out, a permit modification may be triggered either by a request from the permittee or by a reevaluation of the circumstances of the permit. 33 C.F.R. § 325.7(b). If the modification is triggered by a request from the permittee, it may be authorized when the COE and permittee agree to the terms of the modified permit and the modification is required by the public interest. *Id.* If a resource agency previously expressed a significant interest about a project, the COE is required to consult with that agency before modifying any permit terms or conditions that would result in greater impacts by that project.[14] *Id.* The COE met and exceeded the requirements of this abbreviated process, in light of its finding that the proposed work was a minor modification with no significant environmental or socioeconomic impacts and the fact that it nonetheless consulted with the U.S. Fish and Wildlife Service and the Louisiana Department of Wildlife and Fisheries over the now-mooted concerns regarding the Louisiana black bear. Doc. 269, att. 3, pp.

---

[14] Plaintiffs also allege that the COE erred in failing to consider the applicant's compliance with the terms of the permit in its 2014 decision. The Court handles this claim infra.

24, 85 (COE01093, COE01154). Accordingly, plaintiffs show no arbitrary, capricious, or illegal action by the COE under this claim.

### ii. NEPA violations

The plaintiffs argue that the COE violated NEPA by failing to adequately consider alternative sites/project designs, as described above, and by failing to consider the project's impacts on the crawfishing industry and Fisher Lake ecosystem. In considering these claims the Court also reviews the depositions of project manager Michael Herrmann, supra.

### a. Consideration of alternative designs

NEPA requires an agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). Unlike the "least damaging practicable alternative" requirement under the CWA, NEPA's mandate is "essentially procedural" and does not prescribe a particular result. *Shoreacres*, supra, 332 F.Supp.2d at 1005 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978)). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). An agency does not act arbitrarily and capriciously under NEPA by rejecting "even viable and reasonable alternatives," so long as it first conducts an appropriate evaluation. *City of Dallas v. Hall*, 562 F.3d 712, 718 (5th Cir. 2009). Additionally, "the range of alternatives that the [agency] must consider decreases as the environmental impact of the proposed action becomes less and less substantial." *Id.* (quoting *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994)) (alterations in original). In reviewing an agency's evaluation, the Court must keep in mind "that such decisions

are bound by a rule of reason and practicality." *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004) (internal quotations omitted). Accordingly, the plaintiff will only succeed if he shows that the agency failed to grant due consideration to a reasonable alternative.

Plaintiffs maintain that the COE granted only cursory consideration to design alternatives and allege that the COE ignored record evidence "of the practicability of a lower wooden weir." Doc. 280, att. 1, pp. 12–13. To this end they point to references in the administrative record to a smaller, wooden weir and culvert system that existed at Fisher Lake before the installation of the current water control system in 1999. *See* doc. 38, att. 14, p. 2 (COE00051); doc. 102, att. 12, p. 44 (COE00867). These passages, however, only show that such a system existed in the past – not that it was practicable. Indeed, the record also shows that the replacement of the old system came at the recommendation of a representative of the Louisiana Department of Wildlife and Fisheries ("LDWF"), "to better control the water levels in Fisher Bottoms in order to create a more favorable waterfowl habitat and to prevent undesirable plant species from invading the area" and continue the "active waterfowl management" in place at Fisher Bottoms for over fifty years. Doc. 38, att. 14, p. 2 (COE00051).

The plaintiffs also rely on COE project manager Michael Herrmann's statement, in his 2015 deposition, that he considered a no-action alternative but did not consider "a smaller water control structure that was a lot more similar to the wooden weir." Doc. 273, att. 25, p. 94 (COE01522). However, this statement must be balanced against record evidence above showing that the LDWF had recommended replacement of that system, and the COE's unrefuted finding in the 2013 reevaluation and transfer decision that a "smaller project design" was not a practicable alternative because "less pumping and less water storage capacity would more likely make

preservation of the present wetland habitat more difficult."[15] Doc. 102, att. 12, p. 10 (COE00833).

The statement must also be balanced against the COE's repeated finding of minimal adverse impacts of the system in place, which decreased the range of alternatives the agency was required to consider. In view of plaintiffs' failure to rebut this evidence, they cannot show their proposed alternative was reasonable and owed any more consideration than it received. Their disagreement with the result reached is insufficient to show a lack of NEPA adherence, without evidence of the COE's failure to adhere to NEPA procedures. Accordingly, plaintiffs have not shown that the COE acted arbitrarily or capriciously in this regard.[16]

### b.  Consideration of alternative sites

The plaintiffs also maintain that the COE erred under NEPA by failing to consider alternative sites for the project. As noted above, however, plaintiffs fail to show any error to the COE's conclusion that the purpose of the project was site-specific, and that no practicable alternative sites existed for the project that could accomplish its goals of maintaining the wetland and waterfowl habitat in Fisher Lake. Accordingly, they fail to show that the COE acted arbitrarily and capriciously under NEPA in the consideration it granted to alternative sites.

### c.  Impact on crawfishing

The plaintiffs next allege that the COE erred in failing to adequately consider the impact of the approved project and modifications on crawfishers. As plaintiffs note, NEPA applies to

---

[15] The consideration of other project designs in the 2010 individual permit decision was shorter, but still provided that the existing design "is believed to be the most practical and beneficial option" due to its lack of substantial, long-term adverse impact and of the "major objective" of "[assuring] appropriate, annual water levels are maintained over a 600 acre site." Doc. 38, att. 30, pp. 2–3 (COE00144–45).

[16] Plaintiffs argue that the 2013 consideration of design alternatives was inadequate because it only contemplated a smaller option that would involve "less pumping **and** less water storage capacity." Doc. 280, att. 1, pp. 12–13 (quoting doc. 102, att. 12, p. 10 (COE00833)) (emphasis added in plaintiffs' brief). Plaintiffs fail to show the existence of a "smaller, lower, or different kind of dam structure which would not block water, aquatic life, and people in boats" that would not impact the system's pumping and water storage capacity. *Id.* Accordingly, they show no error in the COE's decision to discount such alternatives.

agency actions affecting "the quality of the human environment," which is interpreted "comprehensively to include the natural and physical environment and the relationship of people with that environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.14. Related guidelines mandate consideration of the project's impact on "[r]ecreational or commercial fisheries," as it relates to the suitability of the site "as habitat for populations of consumable aquatic organisms." 40 CFR § 230.51.

The COE made findings on the impact to the site as a habitat for crawfish in both the 2010 individual permit decision and the 2013 reevaluation and transfer decision. In both decisions it determined that the project provided a habitat that should support various fish species as well as commercially desirable red swamp crawfish in adjacent waters, resulting in a benefit to recreational and commercial interests. Doc. 38, att. 30, p. 8 (COE00150); doc. 102, att. 12, p. 21 (COE00844). Finally, it noted that short-term increases in turbidity could result, but that the impact on water quality would be beneficial and the impact on the annual flood cycle would be minor. Doc. 38, att. 30, pp. 4–5 (COE00146–47); doc. 102, att. 12, pp. 12–14 (COE00835–37).

Plaintiffs dispute these findings because of the lack of evidence that the applicants had any interest in crawfishing and argue instead that the record shows that the COE "utterly ignored the impact of the project on commercial crawfishermen." Doc. 280, att. 1, p. 18. They criticize the agency's finding in the 2013 decision that the Fisher Lake habitat improvements should provide a habitat that supports various fish species as well as commercially desirable red swamp crawfish, and therefore "may benefit recreational and commercial interests." Doc. 102, att. 12, p. 21 (COE00844). In support, they point to the first 2012 declaration of crawfisher Jody Meche, which was part of the administrative record before the Court. Meche asserts that the water control system disrupts the natural flow of water and blocks his access to Fisher Lake, where he would ordinarily

be able to fish and hunt. Doc. 273, att. 18, p. 2 (COE01403). He also asserts that the dam may prevent spawning in Fisher Lake by blocking fish and other aquatic life from entering the area, and that the permittee's plan to drain the lake and spray herbicides over the bottom will impact fish and wildlife. *Id.* at 3 (COE01404).

The COE addressed the navigational concerns in both decisional documents. It determined that the project would pose "[n]o significant impediment to navigation." Doc. 38, att. 30, pp. 9, 13–4 (COE00151, COE00155–56); doc. 102, att. 12, p. 22 (COE00845). In the 2010 individual permit decision, it observed, based on field investigation of the project site, that "the natural channels effected [*sic*] by the water control structures and dam were obstructed by mature trees and therefore [inaccessible] by boat during low water conditions." Doc. 38, att. 30, pp. 13–14 (COE00155–56). It also noted that "most of the Atchafalaya Basin is accessible during flood periods and would be unaffected by the project structures." *Id.* In the 2013 transfer and reauthorization decision it again concluded that the area was inaccessible during non-flood conditions, due to its observation of "a wooded floodplain below the water control structure," but that the area was accessible from multiple locations during the flood stage. Doc. 102, att. 12, p. 22 (COE00845).

The COE and plaintiffs disagree about the impact of the water control structure on crawfishers' access to the site. [17] As the COE pointed out in response to plaintiffs' comments on navigability, and unrefuted by Plaintiffs, "[property] disputes are not a factor in the [COE's] public interest decision" and the COE "is not required to determine property rights in its permit

---

[17] The plaintiffs show that the COE received evidence of the crawfishers' ability to navigate the passages obstructed by trees even at lower water levels of 11 to 12 feet. Doc. 115, atts. 3–5 (COE00975–1032); doc. 102, att. 4, pp. 46–47 (COE00450–51); doc. 273, att. 19, p. 2 (COE01407). The COE instead relied on its own site visit to determine navigability impacts. *See, e.g.*, doc. 102, att. 12, p. 22 (COE00845) (providing opinion of three officials from site visit that "the Atchafalaya River must reach a flood stage of 17 to 18-feet elevation or higher . . . to allow navigation into Fisher Bottom[s]" and that during such flood stages the site is accessible from multiple locations).

evaluation." Doc. 102, att. 12, p. 31 (COE00854). The COE also noted that the Louisiana Attorney General had been asked whether the project could impede a state law public right of passage, and had offered no comment. *Id.*

Even if plaintiffs could show that the COE was required to consider commercial crawfishers' ability to cross/access Mallard Basin's property, they could not show that COE's decision to credit its own site visit over the plaintiffs' contention was arbitrary or capricious under NEPA – again, that statute relates to procedure and does not guarantee a particular result. "[I]f the agency considers the factors and articulates a rational relationship between the facts found and the choices made, its decision is not arbitrary and capricious." *Delta Found. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002) (quoting *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994)). The COE received public comments, conducted its own investigation, responded to public comments, and ultimately decided that its own findings were the more trustworthy.

As for Meche's supposition that the project could impact crawfish spawning and disrupt the flooding cycle, and the plaintiffs' argument that the COE could not properly consider the impact on crawfishing because the permittees were not crawfishers, these are not enough to show that the COE's reliance on its own officials' site visits, environmental assessment and conclusions about the project's impact on the site as a habitat for crawfish were insufficient under NEPA. Doc. 102, att. 12, pp. 29–35 (COE00852–58) (agency response to public comments received). Accordingly, plaintiffs fail to show that the COE acted arbitrarily or capriciously regarding these considerations.

### d. *Impact on fish and other aquatic life*

Plaintiffs also argue that the above considerations fell short under NEPA due to the COE's alleged disregard of its obligation to consider the project's effects on fish and other aquatic life.

Doc. 280, att. 1, pp. 22–23. Under the applicable regulations and guidelines, the COE must consider a project's impact on public interest factors, including "[a]quatic organisms in the food web." 33 C.F.R. § 320.4(a)(1); 40 C.F.R. § 230.31. The COE must take a hard look at direct, indirect, and cumulative impacts of a project before reaching a conclusion about the possible significance of the impacts. 40 C.F.R. §§ 230.31, 1508.7, 1508.8(a)–(b). Plaintiffs argue that the COE improperly limited its consideration of this factor to "short-term" impacts and failed to address "the undoubtedly continuous impacts to fish in Fisher Lake from a permanent, impassable dam structure." Doc. 280, att. 1, p. 22.

Other than the inadmissible Kemp report, plaintiffs only point to the declaration of crawfisher/LCPAW president Mike Bienvenu, who states that the water control structure will have negative impacts on fish migration and the surrounding ecosystem. Doc. 273, att. 21, pp. 3–5 (COE01414–16)). As the COE notes, however, it considered the project's possible short-term effects on fish after determining that fish and other aquatic animals would **only** be subject to short-term, localized impacts. Doc. 38, att. 30, pp. 6–7 (COE00148–49). Bienvenu's unsupported opinion is not enough to show that the COE's consideration was inadequate or its findings erroneous. Accordingly, plaintiffs fail to show that the agency acted arbitrarily or capriciously in this regard.

### iii. Failure to comply with regulations in 2014 modification decision

Plaintiffs maintain that the COE was also required to reevaluate the circumstances of the permit under this authorization and that it nonetheless failed to consider the extent to which Atchafalaya Investments had complied with the terms of its permit before granting the modification request. Doc. 280, att. 1, pp. 23–25; doc. 296, p. 11. Such a reevaluation is not mandatory under the relevant COE regulation, which instead provides that:

> [t]he district engineer **may** reevaluate the circumstances and conditions of any permit . . . either on his own motion, at the request of the permittee, or a third party, or as the result of periodic progress inspections, and initiate action to modify, suspend, or revoke a permit as may be made necessary by considerations of the public interest.

33 C.F.R. § 325.7(a) (emphasis added). There is no indication of a request to reevaluate and no evidence that the district engineer erred by finding that one was not necessary under the permit modification process described under § 325.7(b). Although plaintiffs argue that such a reevaluation was necessary because the document granting the 2014 permit request was titled a "Permit Evaluation and Decision Document," they show no requirement that the COE conduct a reevaluation of the permittee's compliance before authorizing the requested modification.

In sum, as a matter law, plaintiffs cannot establish any grounds for overturning the COE's permitting decision. Thee COE is therefore entitled to summary judgment dismissing plaintiffs' claims in the Member Case.

### III.
### MOTION FOR SUMMARY JUDGMENT IN THE LEAD ACTION

Mallard Basin and WBI also move for summary judgment on the lead action, arguing that the COE's permits have mooted all claims against them under plaintiffs' CWA citizen suit.[18] Doc. 288. They assert that the lead action became moot in October 2010, when the COE granted their after-the-fact permits and recognized their completion of the requested remediation. Doc. 288, att. 1, pp. 5–6. They also maintain that plaintiffs' citizen suit, filed after the COE's March 2010 cease and desist order, is barred under 33 U.S.C. § 1319(g)(6)(B)(ii), which applies when the agency "has commenced and is diligently prosecuting an action under this subsection" against defendants. *Id.* at 9–10.

---

[18] Atchafalaya Investments is not a party to the lead action and does not have any interest in its dismissal. Accordingly, it does not join this motion.

Plaintiffs oppose the motion, arguing that the mootness arguments have no merit unless Mallard Basin and WBI can carry their burden of showing that the permits at issue in the member case are valid and enforceable, that the permits extinguish each CWA violation alleged in the member action, or that the permits "have brought the illegal conduct alleged in [the lead action complaint] into full compliance with [the CWA]." Doc. 294, p. 11. They also dispute the statutory preemption argument claim, denying that the cease and desist order amounted to a commencement of agency enforcement action under the CWA and maintaining that even if it did, it did not amount to diligent prosecution. *Id.* at 28–32. The COE's actions have been upheld by this Court, supra, and so the only relevant arguments are whether these have extinguished the claims for relief under the citizen suit and whether statutory preemption applies.

### A. The Mootness Doctrine and Citizen Suits Under the Clean Water Act.

Article III mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980). The Court's jurisdiction over a lawsuit depends on the parties maintaining a personal stake in the outcome. *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477–78 (1990) (internal quotations omitted). "[A]ny set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006). Accordingly, a case should be dismissed as moot when the parties are no longer adverse or when they lack a legally cognizable interest in the outcome of the suit. *In re Scruggs*, 392 F.3d 124, 128 (5th Cir. 2004). However, a case should not be declared moot so long as "the parties maintain a concrete interest in the outcome and effective relief is available to remedy

the effect of the violation." *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998) (internal quotations omitted).

The mootness doctrine applies to actions under the CWA and may require dismissal of a CWA citizen suit based on subsequent agency actions or the cessation of a CWA violation. Primary responsibility for enforcing the CWA rests with the state and federal governments. *Piney Run Pres. Ass'n v. Cty. Comm'rs*, 523 F.3d 453, 456 (4th Cir. 2008) (quoting *Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs*, 504 F.3d 634, 637 (6th Cir. 2007)). To ensure "a second level of enforcement," the Act's citizen suit provision, 33 U.S.C. § 1365, authorizes citizens "to bring suit against any NPDES permit holder who has allegedly violated its permit." *Piney Run*, 523 F.3d at 456 (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 152 (4th Cir.2000) (en banc)). Citizen suits are meant "to supplement rather than to supplant governmental action," allowing citizens "to abate pollution when the government cannot or will not command compliance." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60, 62, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987)); *see also Lockett v. EPA*, 319 F.3d 678, 684 (5th Cir. 2003) ("[T]he primary function of the provision for citizen suits is to enable private parties to assist in enforcement efforts where Federal and State authorities appear unwilling to act.") (internal quotations omitted). In *Gwaltney*, the Supreme Court held that federal courts are without jurisdiction to hear citizen suits under the CWA alleging "wholly past violations." 484 U.S. at 64, 108 S.Ct. at 385. Analyzing the "language and structure of . . . . the citizen suit provisions" of the CWA, the Court found it "plain that the interest of the citizen-plaintiff is necessarily forward-looking." *Id.* at 59, 108 S.Ct. at 382. The Court also cautioned against an overly broad interpretation of the "scope of the citizen suit [which] would change the citizens' role from interstitial to potentially intrusive." *Id.* at 61, 108 S.Ct. at 383. While *Gwaltney* dealt with

-31-

standing at the outset of the case, courts have held that subsequent agency action or the cessation of violations during a citizen action may moot the case. *See Carr v. Alta Verde Indus.*, 931 F.2d 1055, 1062 (5th Cir. 1991) ("A suit may be dismissed because the defendant complies with the [CWA] *subsequent to the complaint* if the defendant's compliance moots the action.") (emphasis in original)

Whether a subsequent agency action moots a citizen suit turns on whether the defendant's compliance is voluntary or involuntary. *Environ. Conserv. Org. v. City of Dallas* ("ECO I"), 529 F.3d 519, 528 (5th Cir. 2008). Where the compliance is involuntary, the agency enforcement moots the citizen suit unless the citizen suit plaintiff "proves that there is a realistic prospect that the violations alleged in its complaint will continue notwithstanding [the agency action]." *Id.* Where, however, the compliance is voluntary, the suit is not moot unless the defendant demonstrates "that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to occur." *Carr*, 931 F.2d at 1062 (emphasis in original) (quoting *Gwaltney*, 484 U.S. at 66). "This standard protects plaintiffs from defendants who seek to evade sanction by predictable protestations of repentance and reform after a lawsuit is filed but who then continue their unlawful conduct upon dismissal of the suit." *Ctr. for Biological Diversity, Inc. v. BP America Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013) (internal quotations omitted).

In *ECO I* the Court determined that defendant's entrance into a consent decree with the EPA, following commencement of agency enforcement action and the filing of a CWA suit by the EPA, rendered the defendant's compliance involuntary. 529 F.3d at 523, 528. It contrasted these circumstances with voluntary compliance, where there would be "no impediment" to the defendant backtracking on its compliance measures after the citizen suit was dismissed. *Id.* On the other hand, in *Laidlaw Environ. Servs. (TOC), Inc.*, 528 U.S. 167 (2000), the Supreme Court applied the

voluntary cessation standard to a matter begun after agency enforcement action. In that matter, however, the Court emphasized that the defendant had invited the agency to file a CWA suit against it, paid the filing fee, and even drafted the complaint for the agency solely to block the plaintiff's threatened citizen suit. *Id.* at 176–77.

## B. Applying the Mootness Doctrine to Plaintiffs' Claims for Injunctive and Declaratory Relief.

Here there is no indication that Mallard Basin invited the COE's investigation and involvement. Instead, the record shows that Mallard Basin began complying with the COE upon its issuance of the March 2010 cease and desist order. In an accompanying letter, the COE informed Mallard Basin that its unpermitted work exposed it to liability under the CWA and that further unauthorized work "may result in an enforcement action, including possible litigation." Doc. 38, att. 4, p. 1 (COE00003). It emphasized that a record of the violation would be kept on permanent file and that Mallard Basin's "prior knowledge of federal permitting requirements and the activities associated with the previous enforcement action" would be taken into account in determining if future enforcement action was warranted. It also noted that it did not believe judicial proceedings were warranted at this time, due in part to Mallard Basin's "willingness to cooperate," but that failure to comply with the cease and desist order would result in "appropriate legal action." *Id.* Mallard Basin also executed a tolling agreement with the COE, as required under COE regulations, in which they agreed that the statute of limitations on a government CWA suit would be tolled from the present until one year after the COE's decision on Mallard's after-the-fact permit application. *Id.* at 2–3 (COE00004–05). In short, Mallard Basin acted under threat of future legal action from the COE. Unlike a case of voluntary compliance where defendants would face no impediment to backtracking on their compliance efforts following dismissal, Mallard Basin obtained its permit after the COE had commenced an enforcement action and under threat of

judicial proceedings based on its failure to comply. Because defendants' actions were involuntary, the plaintiffs must show "a realistic prospect that the violations alleged in the complaint will continue" notwithstanding the enforcement action.

Based on the summary judgment record, there is no such "realistic prospect" of future violations. The COE has issued permits for the challenged structures and defendants completed remediation work required by the COE. Furthermore, the Court has denied the challenge to the COE's actions in the Member Case. There is no allegation that Mallard Basin or Atchafalaya Investments engaged in un-permitted activity on the land since that time.[19] Defendants have also been informed of the likelihood of legal action if they proceed with unauthorized activities or commit any other violations. Plaintiffs fail to show any realistic prospect that a party or its successor will undertake any other unpermitted work on the subject property.

Plaintiffs also contend that the permits do not moot the action because the March 2010 cease and desist order related only to the replacement and upgrade of the water control structure "without addressing the other violations detailed in Plaintiffs' pre-suit notice and Complaint," namely relating to dredging and deposition of fill material. Doc. 294, p. 31. As Mallard Basin and WBI argue, however, the citizen suit is factually and legally predicated on alleged unpermitted violations of the CWA. *See* doc. 1, ¶ 41. All of plaintiffs' allegations are covered by the COE's after-the -fact permits, as upheld by this Court above. Accordingly, the fact that the cease and desist order did not specifically address dredge and fill operations does not prove any unresolved alleged CWA violations. Viewing the summary judgment record in its entirety, the Court

---

[19] The relationship between Mallard Basin and Atchafalaya Investments, which share a mailing address and president/manager, is not clear. *See* Louisiana Secretary of State: Search for Louisiana Business Filings, Mallard Basin, Inc. (https://coraweb.sos.la.gov/CommercialSearch/CommercialSearchDetails.aspx?CharterID=587604_CBC E936B93) and Atchafalaya Investments, LLC (https://coraweb.sos.la.gov/CommercialSearch/CommercialSearch Details.aspx?CharterID=942071_FA151DE8BA) (last visited Nov. 30, 2018). Accordingly, the fact that Mallard Basin no longer owns the property at issue cannot be counted as a reason for determining that there is no realistic prospect that its unpermitted actions will recur.

concludes that the plaintiffs' claims for injunctive and declaratory relief [20] are moot because there is no "realistic prospect that the violations alleged in its complaint will continue" in light of the COE's actions and defendants' compliance with the COE's actions.

## C. Applying the Mootness Doctrine to Plaintiffs' Claims for Penalties.

Plaintiffs further argue that, even if the COE's actions and defendants' remediation efforts moot their claims for injunctive and declaratory relief, they do not moot their claims for civil penalties under the CWA. Plaintiffs cite cases where courts have distinguished between injunctive relief and civil penalties in determining whether subsequent events moot a citizen suit. *See, e.g., Resources Defense Counsel, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 503 (3d Cir. 1993); *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 879 F.2d 1128, 1135 (11th Cir. 1990) (holding that "the mooting of injunctive relief will not moot the request for civil penalties as long as such penalties were rightfully sought at the time the suit was filed.") *Old Timer, Inc. v. Blackhawk-Central City Sanitation Dist.*, 51 F.Supp. 2d 1109, 1116 (D. Colo. 1999) (observing that the "overwhelming majority of circuits" have held that a "polluter's post-complaint compliance" does not necessarily moot a claim for civil penalties even if it may moot a claim for injunctive relief); *see also Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1153 (9th Cir. 2000) (observing that "monetary penalties continue to fulfill their purpose after the issuance of a new permit" by deterring "future violations of the Clean Water Act even when injunctive relief is inappropriate.") (Citing *Laidlaw*, 528 U.S. at 185). Other courts, however, have found that the issuance of a permit or other agency action after the filing of a citizen suit may

---

[20] Civil penalties in a CWA suit are payable to the United States Treasury, not the plaintiff – plaintiff merely assumes the role of a "private attorney general" by filing a citizen suit. *ECO I*, 529 F.3d at 530–31. Accordingly, the only argument for considering an award of civil penalties after the suit is mooted by agency action is based on their deterrent effect. *Id.* at 528–31. Because the plaintiffs have not shown a reasonable prospect that the activities will occur, there is no basis for supplementing the agency enforcement by assessing penalties for a now-remedied violation.

indeed moot even claims for civil penalties. *See, e.g., Mississippi River Revival, Inc. v. City of Minneapolis, Mn.*, 319 F.3d 1013, 1016 (8th Cir. 2003) (ruling that claims for civil penalties were moot after the issuance of permits); *Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 637 F.Supp. 2d 983, 988-89 (N. D. Ala. 2009) (allowing the plaintiff "to make a separate claim for civil penalties would call upon this court to second-guess [the agency's] evaluation of the proper penalty."); *Orange Environment, Inc. v. County of Orange*, 923 F. Supp. 529, 538-39 (S.D.N.Y. 1996) (claims for civil penalties mooted by defendant's compliance with orders issued by the EPA and COE).

The Fifth Circuit has ruled both ways with respect to civil penalties. In *Carr*, 931 F.2d at 1064-65, the court concluded that the defendant's voluntary compliance did not moot claims for civil penalties. The court based its conclusion, in part, on evidence that the defendant could continue sporadic discharges in the future that violate the CWA. The court also noted that the defendant's voluntary actions did not exempt it from the need for a permit, and that it never sought a permit. *Id.* In contrast, in *ECO I*, the court concluded that agency action mooted claims for civil penalties under the CWA. In *ECO I*, the defendant entered into a consent decree with the EPA after the EPA commenced an enforcement action. The consent decree provided for the payment of some penalties, required the defendant to undertake supplemental environmental projects, and provided for audits and additional monitoring. *Id.* The plaintiff countered that the civil penalties assessed by the EPA in the consent decree were insufficient. The Fifth Circuit rejected the plaintiff's argument and held that the EPA's actions and the defendant's compliance with the consent decree mooted the plaintiff's claim for civil penalties. *Id.* The court held that the defendant's actions were not voluntary and that the plaintiff's citizen suit would merely duplicate rather than supplement the regulatory actions of the EPA. *Id.* The court noted that the EPA and

other regulatory agencies have a range of enforcement options available, of which civil penalties are only one option, and that a CWA citizen suit should not "upset the primary enforcement of the EPA by seeking civil penalties that 'the Administrator chose to forego.'" 529 F.3d at 531 (quoting *Gwaltney*, 484 U.S. at 61).

Considering the summary judgment record as a whole, the present case is more analogous to *ECO I* than *Carr*. Here, unlike *Carr*, the actions of the defendants to comply with the CWA were not voluntary. The defendants applied for an after-the-fact permit only after the COE commenced enforcement by issuing a cease and desist letter. The COE gave defendants the option of applying for an after-the-fact permit and undertaking certain remediation work in lieu of further enforcement action. Although the consent decree in *ECO I* included the payment of some penalties, the COE did not pursue penalties in the present case given its permitting decision and the remedial work performed by defendants following the cease and desist order. As in *ECO I*, allowing a citizen suit to seek additional civil penalties under these circumstances would supplant the COE's choice of enforcement mechanisms that it uses to achieve its ultimate goal of bringing defendants into compliance with the CWA. *Id.* at 531.

Moreover, civil penalties in a CWA citizen suit are payable to the United States Treasury, not the plaintiff, who merely assumes the role of a "private attorney general" by filing a citizen suit. *ECO I*, 529 F.3d at 530–31. In light of the plaintiff's role in a CWA citizen suit, the only argument for considering an award of civil penalties after injunctive relief is mooted by agency action is the deterrent effect of the penalties. *Id.* at 528–31. Here, the Court has concluded that there is no reasonable prospect that CWA violations will recur given the COE's permitting decisions and defendants' compliance. As a result, any deterrent effect is too speculative to

support an Article III case or controversy with respect to civil penalties. The plaintiffs' claims for civil penalties are therefore moot.

### D. Applying the Mootness Doctrine to Plaintiffs' Claims for Attorney Fees.

Finally, plaintiffs contend that their claim for attorney fees under the CWA remains viable. Doc. 294, pp. 24–25. The statutory basis for plaintiffs' claim is 33 U.S.C. § 1365(d), which provides that "[t]he court . . . may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). In order to qualify as a "prevailing party," a plaintiff must "(1) obtain actual relief, such as an enforceable judgment or a consent decree; (2) that materially alters the legal relationship between the parties; and (3) modifies the defendant's behavior in a way that directly benefits the plaintiff at the time of the judgment or settlement." *Dearmore v. City of Garland*, 519 F.3d 517, 521 (5th Cir. 2008). In determining who is a "substantially prevailing party," the court has stated that these three elements remain a factor but "may not need to be satisfied in full." *Envtl. Conserv. Org. v. City of Dallas ("ECO II")*, 307 Fed. App'x 781, 784 (5th Cir. 2008) (unpublished).

Plaintiffs rely on case law premised on the "catalyst theory," under which a plaintiff qualifies as a prevailing party if the plaintiff spurs the agency action that brings the defendant into compliance with the CWA. Doc. 294, pp. 24–25. The Supreme Court rejected the catalyst theory as a basis for awarding attorney fees in *Buckhannon Board & Care Home v. West Virginia Department of Health and Human Resources*, 532 U.S. 598 (2001), and courts have subsequently held that this theory was not revived by statutory language allowing an award of fees to a "substantially prevailing party." *ECO II*, 307 Fed. App'x at 784–85 and cases cited at n. 1. Accordingly, failure to obtain judicially sanctioned relief bars a plaintiff from recovering fees. *Union of Needletrades, Indus. And Textile Employees, AFL-CIO, CLC v. U.S. I.N.S.*, 336 F.3d 200,

206 (2d Cir. 2003). Here there is no consent decree or other judgment regarding the alleged violations – merely Mallard Basin's compliance with the COE enforcement action and pursuit of permits subsequently upheld by this Court. Accordingly, plaintiffs do not qualify as prevailing parties.

Even if the catalyst theory is preserved under the CWA's fee-shifting provision, they fail to show that their suit caused Mallard Basin's compliance with the COE. Under this theory, a plaintiff must show (1) that the relief he sought was actually obtained and (2) "that the suit itself caused the defendant to alter its conduct." *Foreman v. Dallas Cnty.*, 193 F.3d 314, 320 (5th Cir. 1999). As noted above, the cease and desist order resulted from an anonymous complaint to the COE. The plaintiffs fail to show that their CWA suit played any role in the actions of the COE or Mallard Basin, let alone that it was the cause.

## IV.
### CONCLUSION

For the reasons provided above, the plaintiffs' Motion to Strike [doc. 297] is **GRANTED**. The Motion for Summary Judgment [doc. 292] filed by the COE is **GRANTED** and the Motion for Summary Judgment [doc. 280] filed by plaintiffs is **DENIED**. Accordingly, all claims in the member action are **DISMISSED WITH PREJUDICE**. Likewise, the Motion for Summary Judgment [doc. 288] filed by Mallard Basin and WBI is **GRANTED** and the lead action is **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** in Chambers this 9th day of January 2019.

_____
ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE